IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 11, 2015

## STATE OF TENNESSEE v. CLAUDALE RENALDO ARMSTRONG

**Appeal from the Circuit Court for Marshall County**
**No. 12-CR-170, 12-CR-172     Franklin L. Russell, Judge**

———————————

**No. M2014-01041-CCA-R3-CD – Filed April 30, 2015**

———————————

A Marshall County Circuit Court jury convicted the Defendant-Appellant, Claudale Renaldo Armstrong, of sale of .5 grams or more of cocaine base; delivery of .5 grams or more of cocaine base; sale of less than .5 grams of cocaine; and delivery of less than .5 grams of cocaine. See T.C.A. § 39-17-417 (2011). The trial court merged the four alternative counts into two convictions and sentenced Armstrong as a Range II, multiple offender to a total effective sentence of twenty-six years in the Department of Correction. The sole issue presented for our review is whether the evidence is sufficient to support the convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROGER A. PAGE, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the Defendant-Appellant, Claudale Renaldo Armstrong.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Robert Carter, District Attorney General; and Weakley E. Bernard, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal arises from two separate drug transactions between the Defendant-Appellant, Claudale Renaldo Armstrong, and a confidential informant occurring in Lewisburg, Tennessee. In case number 12-CR-170, Armstrong was indicted by the Marshall County Grand Jury for both the sale and delivery of .5 grams or more of cocaine

base for a controlled buy that occurred on July 19, 2011. In case number 12-CR-172, Armstrong was indicted for the sale and delivery of less than .5 grams of cocaine for another controlled buy on August 9, 2011. The trial court consolidated the two cases, and the following proof was adduced at trial.

**Trial.** Doris "Francene" McCall testified that she served as a confidential informant (CI) with the 17th Judicial District Drug Task Force on two occasions and that both of the transactions involved Armstrong. She stated that she became a CI as a favor to her best friend, Wanda Griffin, and she denied that there were any charges against her. McCall said that prior to July 19, 2011, she had known Armstrong for less than a year. During that period, she saw Armstrong more than ten times and could recognize him from a distance. She said that she also recognized Armstrong's voice because they had spoken fifteen or twenty times.

McCall stated that on July 19, 2011, she called Armstrong about purchasing $100 worth of crack cocaine. She suggested that they meet at her home. After they arranged a transaction, Wanda Griffin contacted Tim Miller of the 17th Judicial District Drug Task Force while she was at McCall's residence. Thereafter, Drug Task Force member Travis Childers arrived at the house. McCall then showed Deputy Childers her text message communication with Armstrong. In the texts, McCall asked Armstrong for an "eight ball" which Armstrong said would cost $325.

McCall then set up the controlled buy with Armstrong, and Deputy Childers searched her for contraband. She said that Deputy Childers gave her $150 to purchase drugs and equipped her with a recording device. Armstrong then called her shortly after 2:00 p.m. and asked her to meet him in front of her house in thirty seconds. While McCall was waiting at her front door, an SUV pulled up with a driver and one passenger. She immediately recognized the front-seat passenger as Armstrong and later learned that the driver was "Tiny" or Shelby Harris. McCall testified that there was "no question" that Armstrong was the passenger because she knew him. She approached the front passenger side of the vehicle, where Armstrong was about two feet away and she had an unobstructed view of his face. She said that Armstrong instructed her to reach in the car window where she exchanged $150 for crack cocaine. Armstrong also gave McCall a coupon from Krystal Burger to cover the drugs as she returned to her house. "Tiny" and Armstrong then drove off after the hand-to-hand exchange was completed. McCall returned to her house and gave the crack cocaine to Deputy Childers. The video and audio recordings of the transaction were admitted into evidence and played for the jury. McCall also identified Armstrong in court.

Next, McCall testified regarding the controlled buy that occurred on August 9, 2011. On that day, she communicated with Armstrong by phone and text message to

purchase $100 worth of crack cocaine. McCall, Wanda Griffin, and Deputy Childers met at a predetermined location and traveled to McCall's residence together. After multiple attempts to contact Armstrong, McCall set up a transaction to take place at her house. Deputy Childers searched McCall, gave her $100, and set her up with a recording device. As instructed by Armstrong, McCall placed the money into an empty cigarette pack and waited in front of her house. McCall said that Armstrong arrived shortly in a silver Pontiac car along with two or three other people. She handed her Pyramid brand cigarette pack to Armstrong, who was in the front passenger seat, and received a green L&M brand cigarette pack containing crack cocaine. After Armstrong drove off, McCall returned to her house. She handed the L&M pack to Deputy Childers, who opened it and found crack cocaine inside. The State entered the video and audio recordings of the August 9, 2011 exchange into evidence and showed the recordings to the jury.

On cross-examination, McCall testified that she was paid $100 each time that she was a CI. She acknowledged that she became a CI because of Wanda Griffin and that Griffin did not get along with Armstrong. She denied ever being convicted of a crime or being charged with a drug-related offense. Although McCall was not familiar with crack cocaine, she did not find it unusual that she was able to arrange a buy from Armstrong. She denied ever calling Armstrong before about purchasing crack cocaine. She acknowledged that the transactions occurred three years ago and that her memory was not as good. McCall stated that during the August 9, 2011 transaction, Armstrong was wearing either a white or black tank top.

Deputy Travis Childers of the Marshall County Sheriff's Department was assigned as an agent to the 17th Judicial District Drug Task Force from June 2009 to the end of 2012. He testified, in large part, consistently with the testimony of McCall regarding the two controlled buys of crack cocaine involving Armstrong. In addition, Deputy Childers said that after he was assigned to the Drug Task Force, he developed more familiarity with Armstrong and could identify him on July 19, 2011. He stated that he equipped McCall with a transmitter device so that Assistant Director Tim Miller of the Drug Task Force could listen to and record the transaction in real time. He said that Assistant Director Miller was in a Drug Task Force vehicle outside McCall's house to conduct video surveillance and to monitor the controlled buy.

Deputy Childers remained in the front bedroom where he observed McCall as well as a gray SUV that arrived shortly at the residence. He was able to "see extremely well into the vehicle" and could identify Shelby "Tiny" Harris as the driver and Armstrong as the passenger. He then witnessed what appeared to be a hand-to-hand exchange between McCall and Armstrong. After the transaction, the SUV drove away, and Deputy Childers observed McCall as she returned to the house. He took the narcotics from McCall, searched her again, and maintained custody of the evidence until he returned to the office

and gave the drugs to Director Tim Lane. Deputy Childers testified that there was "[n]o chance" that McCall had a transaction with anyone other than Armstrong, and he identified Armstrong in court.

On August 9, 2011, Deputy Childers returned to McCall's residence. He said that while he was in McCall's front bedroom, Assistant Director Miller and two special agents provided exterior surveillance of the area. Armstrong arrived shortly at the house at around 6:00 p.m. in a silver car. Deputy Childers was about thirty feet away from the car and observed the hand-to-hand exchange between Armstrong and McCall involving the two cigarette packs. He could only identify Armstrong, who was in the front passenger seat. After McCall handed the green cigarette pack to Deputy Childers, he verified that the pack contained crack cocaine, secured the evidence, and transferred it to Director Lane of the Drug Task Force. The State introduced the seized crack cocaine from both transactions into evidence.

Lieutenant Tim Miller of the Bedford County Sheriff's Department had been specially assigned to the 17th Judicial District Drug Task Force for nearly fourteen years. As the Assistant Director of the Drug Task Force, he was responsible for supervising agents in the field. He testified, in large part, consistently with the testimonies of Deputy Childers and McCall. In addition, Assistant Director Miller said that he parked his unmarked vehicle and set up surveillance in front of McCall's residence on July 19, 2011. He was previously acquainted with Armstrong and could identify him prior to that date. From his vantage point, Assistant Director Miller could clearly see the driver and passenger in the SUV that passed about ten feet away from him. He had an unobstructed view of McCall's residence and used a handheld video camera to record the transaction. He positively identified Armstrong in court as the front-seat passenger in the video.

On August 9, 2011, Assistant Director Miller set up surveillance of McCall's residence from a different vantage point. He once again operated a handheld camera to record what he observed. As before, he was aware of the suspect's identity but not of the route or vehicle that would be used. On that occasion, he saw a silver Pontiac approach the house from the same route that the SUV had previously taken. He had to duck down as the vehicle approached and did not positively identify the front-seat passenger before the vehicle drove away. Assistant Director Miller did not stop the silver car for fear of exposing McCall as a CI. Therefore, he instructed Agent Shane George to monitor the vehicle and to conduct a valid traffic stop. He then recorded the stop, which occurred about ten minutes after the controlled buy. In the video recording, which was played for the jury, Assistant Director Miller identified Armstrong as the individual dressed in a black T-shirt on the front passenger side of the silver Pontiac. Apart from the driver and Armstrong, there was also a passenger in the back seat. Later in the video, Armstrong had removed his black shirt and was shown wearing a white T-shirt. Assistant Director

Miller agreed that there was only one occupant in the back seat and that the individual was a black male.

Shane George of the Shelbyville Police Department testified that he had been assigned as a special agent to the Drug Task Force for the past fourteen years. He said that he was only involved in the August 9, 2011 transaction. On that occasion, he was assigned as a surveillance officer and then conducted a traffic stop of the silver Pontiac as the case progressed. Upon seeing the silver Pontiac approach McCall's residence with Armstrong in the front seat, Agent George alerted the other officers through radio. He stated that he could "very clearly" see Armstrong's face from his vantage point as the Pontiac passed by. About ten minutes after the drug sale, he conducted a traffic stop after the Pontiac failed to completely stop at a stop sign. Prior to this date, Agent George was already acquainted with Armstrong and could positively identify him. He further identified Armstrong in court.

Director Tim Lane of the 17th Judicial District Drug Task Force testified that he had held his current position for approximately nineteen years. He was ultimately responsible for the members of the Drug Task Force and served as the exclusive evidence custodian. After the two controlled buys took place in this case, Director Lane safeguarded the drug evidence until it was turned over to the Tennessee Bureau of Investigation (TBI) for forensic analysis. He identified the sealed evidence that Deputy Childers handed to him after both transactions.

Special Agent Jennifer Sullivan, a forensic scientist with the TBI Nashville Crime Laboratory, testified that she examined the drug evidence in this case. After conducting two instrumental tests, she determined that the rock-like substance from the first transaction was cocaine base weighing 0.67 grams. Agent Sullivan explained that "crack cocaine" is the street name for cocaine base. She conducted the same instrumental tests with the contents of the second sealed envelope and concluded that the substance was crack cocaine weighing 0.32 grams. She agreed that cocaine and crack cocaine are Schedule II controlled substances. After completing her analysis, Agent Sullivan generated official forensic chemistry reports, which were admitted into evidence.

Armstrong elected not to testify at trial. The defense recalled Agent George and Assistant Director Miller who both testified regarding whether they observed the silver Pontiac stop at one point to pick up a male passenger after the August 9, 2011 transaction.

Based on the above proof, the jury found Armstrong guilty of all four counts as charged. At a subsequent sentencing hearing, the trial court merged counts 1 and 2 into one conviction for the sale of .5 grams or more of cocaine base. The court also merged

counts 3 and 4 into one conviction for the sale of less than .5 grams of cocaine. Armstrong was sentenced as a Range II, multiple offender to eighteen years and eight years for each respective transaction, and his sentences were aligned consecutively for an effective term of twenty-six years' imprisonment. The court also assessed a total fine of $4,000 for both convictions. After the denial of Armstrong's motion for new trial, this timely appeal followed.

## ANALYSIS

On appeal, Armstrong argues that the evidence is insufficient to sustain his convictions. Specifically, he contends that that the State failed to prove his identity as the perpetrator of the offenses beyond a reasonable doubt. He asserts that these cases involve the "highly unlikely premise" that McCall could simply contact him "out of the blue" and purchase crack cocaine even though she had no history of using the drug. Armstrong further maintains that the proof cannot withstand reasonable scrutiny given that McCall was a CI on only two occasions, both of which involved him, and given that McCall knew that Wanda Griffin did not get along with him. Finally, Armstrong complains that "virtually none of the descriptive information" was corroborated in McCall's testimony regarding the second transaction. The State responds that there was ample proof presented at trial for any rational trier of fact to find Armstrong guilty of each element of the crimes beyond a reasonable doubt. Upon review, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct

evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id. Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)).

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the

relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87).

Armstrong was convicted of the sale and delivery of .5 grams or more of cocaine base on July 19, 2011, and of the sale and delivery of less than .5 grams of cocaine on August 9, 2011. To sustain a conviction for these offenses, the State was required to prove beyond a reasonable doubt that Armstrong knowingly sold and delivered cocaine or cocaine base. See T.C.A. § 39-17-417(a)(2), (3) (2011). A violation of subsection (a) with respect to .5 grams or more of cocaine is a Class B felony. Id. § 39-17-417(c)(1). A violation of subsection (a) with respect to less than .5 grams of a Schedule II controlled substance is a Class C felony. Id. § 39-17-417(c)(2)(A).

Armstrong contends that that the State failed to prove his identity as the perpetrator beyond a reasonable doubt. However, when viewed in the light most favorable to the State, there was ample proof to establish that he sold and delivered the relevant amounts of crack cocaine to a CI on two separate occasions. The CI, Doris McCall, testified that she was acquainted with Armstrong and that she could recognize his face and voice. She said that she called Armstrong on July 19, 2011, and on August 9, 2011, to set up drug transactions at her home. TBI lab analysis later revealed that the first transaction involved 0.67 grams of cocaine base and the later transaction involved 0.32 grams. Drug Task Force members Travis Childers, Tim Miller, and Shane George each stated that Armstrong was the target of their investigation and that they were previously acquainted with him. McCall said that she was about two feet away from Armstrong during their hand-to-hand exchanges. Members of the Drug Task Force observed the controlled buys from separate vantage points and recorded their surveillance. They each testified that they had unobstructed views of Armstrong and could identify him without a doubt. McCall and members of law enforcement also positively identified Armstrong as the perpetrator in court. Moreover, the State admitted video and audio recordings of both drug transactions into evidence and showed the recordings to the jury.

In challenging the sufficiency of the convicting evidence, Armstrong is essentially attacking the credibility of McCall and other witnesses of the State. However, as we have previously noted, the jury determines the weight and credibility to be given to the testimony of witnesses and reconciles all conflicts in the evidence. Bolin, 405 S.W.2d at 771; Campbell, 245 S.W.3d at 335. To the extent that there were uncertainties in the testimony about particular details, McCall acknowledged that the transactions occurred three years ago, but she had no doubt regarding her identification of Armstrong as the perpetrator. Moreover, we note that "our duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67

(Tenn. 2011). Based on the evidence, a rational juror could conclude beyond a reasonable doubt that the State established Armstrong's identity as the perpetrator of the two controlled sales in July and August 2011. Accordingly, he is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgments of the Marshall County Circuit Court.


_____
CAMILLE R. McMULLEN, JUDGE